# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MAC FUNDING CORPORATION, a Delaware corporation, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 17 cv 6470 ) |
| MNDUSTRIES, INC., a Georgia corporation, and MICHAEL E. NANCE II, a Georgia citizen, | ) Judge Sharon Johnson Coleman ) ) ) |
| Defendants. | ) ) |
| MNDUSTRIES, INC., a Georgia corporation, and MICHAEL E. NANCE II, a Georgia citizen, | ) ) ) |
| Third-Party Plaintiffs, | ) ) |
| v. | ) ) |
| MC MACHINERY SYSTEMS, INC., a Delaware corporation, | ) ) ) |
| Third-Party Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

Defendants and third-party plaintiffs, Mndustries, Inc. and Michael E. Nance (collectively "MN"), filed an amended four-count third-party complaint against MC Machinery Systems, Inc. ("MMS") seeking indemnification for MN's alleged breach of financing contract with MAC Funding Corporation ("MAC Funding"), and alleging breach of express and implied warranty, and fraud. Third-party defendants, MMS, move to dismiss the amended third-party complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated herein, the motion is granted.

1

**Background**

The following facts are gathered from MN's Amended Third-Party Complaint which the Court takes as true for purposes of the instant motion. MN was a sheet metal fabricator that used laser cutting machines to fabricate specified metal goods for its customers. MMS is a subsidiary of Mitsubishi that markets, sells, installs, and services metal fabrication machinery including laser-cutting machines and associated material handling systems. MN previously purchased equipment from MMS. MN had gone through several cycles of laser machine purchases over its period of operations to keep its equipment current.

In 2014, MMS approached MN to purchase new Mitsubishi laser-cutting machines and the new MMS automated handling system to update MN's production capabilities. MAC Funding Corporation would finance the purchase. MN alleges that MAC Funding is the "captive financing arm" of MMS. MN purchased four new machines from MMS with financing by MAC Funding. The total purchase price for all the equipment exceeded $5 million. The first purchase was executed on July 14, 2014 by Nance on behalf of MN. MMS was to deliver the three other laser cutting machines to MN in September, October, and December of 2015. MN alleges that it spent over $300,000 to prepare its Georgia facility for the installation of the new laser cutting machines.

After some delays, which MN attributes to MMS, the first new laser machine was finally operational at MN's facility on February 18, 2016. It was installed without the River System automation that was to accompany the machine. Over the next seven months the four machines and the River System were installed but never functioned at the cutting proficiency, accuracy, and speed that MMS had represented it would.

MMS representative Rosengren remained on site to work with the machines precision and automation. MMS laser services technician Tracy Marcotte documented in his service report, that the "machine [is] still not cutting good consistently" and that the system had crashed when he

arrived on March 29, 2016. All four machines were up and running on March 29, 2016, but MN alleges that problems persisted, causing improper and inconsistent cuts and the cutting head on one of the machines would fall off during use. Marcotte continued to report issues with the machines and make adjustments to try to fix the problems.

On April 12, 2016, Jim Altenbach and Landon Frick, MMS field service engineers, were on site because of the ongoing issues with the new machines. They documented slow, imprecise, poor, and inconsistent cutting. Altenbach informed Nance that he had resolved the cutting and speed problems. Based on this representation, Nance told MN customers that their overdue orders would be filled shortly. According to MN, Altenbach knew his representations were false because the nozzle he replaced was not the recommended size according to MMS' specifications. Altenbach also knew that MN, through its principal Nance, would rely on the representation.

Within a few weeks Marcotte was back on site to address additional problems with the machines. The problems persisted, MMS sent additional engineers to address the issues. After seven months the inconsistent cutting issues were resolved with a design modification. MN alleges that this design flaw or defect was hidden by MN. According to MN, its failure to deliver orders to its customers for over seven months caused the company to lose business. MN was forced to cease operations.

The sales contract between MN and MMS included a warranty that "the Equipment sold hereunder will be free from defects in material and workmanship." The warranty was for two years from the date of installation at the MN's facility. MN alleges that MMS breached the warranty by providing materially defective equipment, which they repeatedly failed to repair, replace, or refund as required by the sales contract. As a result of the alleged breach of warranty, MN claims to have suffered damages from its continued responsibility for payment for the defective equipment in

3

excess of $5 million and other damages. MN also alleges that MMS breached an implied warranty under the Uniform Commercial Code from the sale of the defective equipment.

MN further alleges that MMS employees repeatedly represented that the laser machines were not defective and "have at all times performed within published specifications for the machine." MN relied on these representations that the cause of the problem was not a design defect, but external factors relating to the facility. MN alleges that the representations by MMS employees were knowingly false and misleading. The MMS representatives allegedly were aware that the laser machines were defective.

Lastly, MN alleges that it is entitled to indemnification from MMS for any damages resulting from the suit filed by MAC Funding against MN for default on the financing contract. MN alleges that MAC Funding is the "admitted captive", under the full control of MMS. Dkt. 35 at ¶100. Further, MN alleges that MAC Funding and MMS are both owned by Mitsubishi Corporation. Thus, MN is seeking implied indemnity through an alter ego theory liability for MN's failure to pay the financing contracts.

**Legal Standard**

A motion to dismiss brought pursuant to Rule 12(b)(6) challenges the legal sufficiency of the pleading. Rule 8(a) applies to most claims and requires a short and plain statement of the claim upon which relief can be granted. To survive dismissal, the counterclaims must state a facially plausible claim that puts the defending party, the Receiver, on notice of the basis of the claims against it. *See Swanson v. Citibank, N.A.,* 614 F.3d 400, 403–404 (7th Cir. 2010). The Seventh Circuit has explained that "plausibility" means, that "the plaintiff [or counterplaintiff] must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Id.* at 404 (emphasis in original). In determining the sufficiency of a counterclaim, the Court accepts as true all well-pleaded factual

4

allegations and draws all reasonable inferences in favor of the non-moving party. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (quoting *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 441–42 (7th Cir.2011)). "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).

**Discussion**

First, MMS argues that this Court should dismiss the amended third-party complaint for failure to state a claim for indemnity. MN concedes that it is not asserting express indemnity, and therefore, this Court only considers whether MN adequately alleges a claim for implied indemnity or non-contractual indemnity.

"Under implied indemnity, a promise to indemnify will be implied by law where a blameless party is derivatively liable to the plaintiff based on the party's relationship with the one who actually caused the injury." *Schulson v. D'Ancona and Pflaum LLC*, 354 Ill. App. 3d 572, 576 (1st Dist. 2004). To state a claim for implied indemnity, under Illinois law, the third-party plaintiff, MN, must allege: (1) a pre-tort relationship between the third-party plaintiff, MN, and the third-party defendant, MMS; and (2) a qualitative distinction between the conduct of MN and MMS. *Id.* Here, MN claims that it is blameless for the alleged default on the financing agreements with MAC Funding because

5

MMS actually caused the default by providing defective equipment that prevented MN from fulfilling customer orders and earning the funds to pay the financing agreements.

In *Schulson*, the Illinois Appellate Court answered one of the questions at issue here – whether a pre-tort relationship can exist where the underlying suit is solely for breach of contract. *Id.* at 577. The court held that a stranger to a contract between two parties cannot be held liable to indemnify one of the parties for breach of contract absent the stranger's express agreement to indemnify. *Id.* (citing with approval the holdings in *Talandis Construction Corp. v. Illinois Building Authority,* 23 Ill. App. 3d 929 (1st Dist. 1974), and *Board of Education of High School District No. 88 v. Joseph J. Duffy Co.*, 97 Ill. App. 2d 158 (2d Dist. 1968)). The court in *Schulson* found that the plaintiff could not seek indemnification for an underlying breach of contract claim against the law firm that assisted in drafting a contract because the law firm was a stranger to the contract and, thus, there was no pre-tort relationship. *Id.*

The same is true here. MMS was not a party to the financing contracts that are the subject of the underlying law suit brought by MAC Funding against MN. Furthermore, there is no express agreement by MMS to indemnify MN for its default on the financing agreements for the equipment. MN contends instead that MAC Funding is the alter ego of MMS, meaning that MMS is not a stranger to the financing agreements.

A party seeking recovery under an alter ego theory must show: (1) "such unity of interest and ownership that the separate personalities of the corporation" and the individual or entity behind it no longer exist; and (2) circumstances indicating that "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Secs., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751–52 (7th Cir. 2012). To assess the "unity of interest and ownership" element, courts consider factors including: "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency

6

of the debtor corporation; (6) non-functioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a shareholder; (10) failure to maintain arm's length relationships among related entities; and (11) whether the corporation is a mere façade for the operation of the dominant shareholders." *Wachovia Secs., LLC v. Neuhauser*, 528 F. Supp. 2d 834, 854–55 (N.D. Ill. 2007) (internal quotation marks omitted); *see also Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 778 (Ill. App. Ct. 2005). No single factor is dispositive. *Neuhauser*, 528 F. Supp. 2d at 855.

Here, MN claims a unity of interest in the barest possible terms. The Amended Third-Party Complaint alleges only that MAC Funding is the captive financing arm of MMS and that MMS promotes and represents to customers that MAC Funding is controlled by MMS. MN points to only one employee, Takashi Aoki, as holding dual titles and roles, but MN does not even provide his title or role. Moreover, the allegation that both MMS and MAC Funding are owned by Mitsubishi does not support a finding that MMS and MAC Funding share a unity of interest. None of the factors usually considered by courts are alleged in the complaint here. Thus, this Court finds the complaint fails to sufficiently allege that MMS is not a stranger to the financing agreements to establish the requisite pre-tort relationship to sustain an implied indemnity claim.

MN's claim for implied indemnity fails for the additional reason that implied indemnity must be premised on vicarious liability, which is reasonably foreseeable. *See Canadian Pacific Ry. Co. v. Williams-Hayward Protective Coatings, Inc.*, No. 02 C 8800, 2004 WL 2108413, *5 (N.D. Ill. Sept. 21, 2004) (St. Eve, J.). Illinois courts recognize that claims for implied contractual immunity may arise where "one party's breach of contract causes a second party to breach a separate contract with a third party." *Id.* (quoting *Carrillo v. Jam Prods., Ltd.*, 173 Ill. App. 3d 693, 697 (1st Dist. 1988)). To justify this result, the damages arising from the breach of the underlying contract must be reasonably within the contemplation of the parties as a probable result of the breach of the second contract

7

with the third party. *Case Prestressing Corp. v. Chicago College of Osteopathic Medicine*, 118 Ill. App. 3d 782, 788 (1st Dist. 1983).

Here, while it is undoubtedly true that if a manufacturer such as MN is unable to fulfill customer orders for a long enough period of time, it is likely to cause financial distress causing it to default on loan agreements. This reasoning however would result in MMS being liable for implied indemnity on any debt owed by MN. This Court has found no authority supporting such a result.

This case is factually analogous to *Wilder Corp. of Delaware v. Thompson Drainage and Levee Dist.*, 658 F.3d 802 (7th Cir. 2011), though the court was considering an appeal from a summary judgment. In that case, the plaintiff was seeking indemnity to shift liability for an underlying breach of contract claim against it. The plaintiff, Wilder Corporation, expressly warranted in the contract of sale for land that there was no petroleum contamination. The purchaser discovered that the land was contaminated and successfully sued Wilder Corporation for breach of warranty. Wilder Corporation then sought indemnification from the drainage district, the party who allegedly caused the contamination. The court held that a blameless or involuntary contract breaker cannot invoke non-contractual indemnity to shift the risk that he assumed in the contract. *Id.* at 805. The court reasoned that to find otherwise could cause the absurd result that an involuntary contract breaker could sue anyone for indemnity who a court might find contributed to the breach. *Id.* Although the court acknowledged that the drainage district was probably the only entity in a position to prevent the contamination, it held that the drainage district could not become the insurer of Wilder's contract for the sale of the land. *Id.* at 806.

Similarly, in this case, MN claims to be the involuntary contract breaker. It was unable to pay on the financing agreements with MAC Funding because it was unable to fill its customer orders. MN is thus seeking to shift the blame for breach of its agreements with MAC Funding to MMS, claiming that MMS caused MN to breach its contract by supplying defective equipment rendering

8

MMS inoperable. However, MN took the risk of not being able to sustain the payments on the financing agreements when it entered those agreements. Any number of occurrences could cause MN to default. This Court has found no authority to support the type of indemnity that MN is seeking.

MMS also moves to dismiss Counts I-III for breach of warranty and common law fraud, arguing that these claims are duplicative of the First Amended Complaint in *MNdustries, Inc. v. MC Machinery Systems, Inc.*, No. 17 C 7226 (N.D. Ill. 2017), currently pending before Judge Gettleman. "As a general rule, a federal suit may be dismissed for reasons of wise judicial administration whenever it is duplicative of a parallel action already pending in another federal court." *Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223 (7th Cir. 1993) (internal quotations omitted). Courts generally consider a suit duplicative if the "claims, parties, and available relief do not significantly differ between the two actions." *Id.* A review of the First Amended Complaint in the case pending before Judge Gettleman establishes that it is identical to the Amended Third-Party Complaint in this case with the exception of the indemnity count in this case. With dismissal of the indemnity count here the two complaints are identical and MN can recover for its remaining counts against MMS in that case. *See La Hispamex Food Prods., Inc. v. Specialty Cheese Co.*, No. 99 C 8479, 2000 U.S. Dist. LEXIS 10194, *9 (N.D. Ill. Jul. 7, 2000) (Leinenweber, J.) (granting dismissal of several counts of a third-party complaint that were duplicative of another action finding that dismissal cannot adversely affect any litigant's interest). This Court dismisses Counts I-III as duplicative of case No. 17 C 7226.

Because this Court finds that MN has not alleged a proper claim for indemnification against MMS, this Court grants dismissal of Count IV of the Amended Third-Party Complaint, and need not address MMS' alternative arguments for dismissal.

**Conclusion**

For the reasons stated herein the Court grants MC Machinery Systems, Inc.'s Motion to Dismiss the Amended Third-Party Complaint[57].

IT IS SO ORDERED.

ENTERED:

Dated: 5/2/18  _____
SHARON JOHNSON COLEMAN
United States District Judge